At a Court of Oyer and Terminer held at this term, Silas Hollis was indicted *Page 25 
and tried for the murder in the first degree, of Robert Morris on the 21st day of August, 1857, at St. Johnstown in Sussex County. The evidence disclosed a deep-seated hostility on the part of the deceased against the prisoner, and repeated declarations of a determination to either whip or to kill him, or be killed by him, and of which the prisoner had been apprised by others prior to the day of the killing. A witness testified that he was at St. Johnstown on the day of the occurrence, when the deceased drove up and stopped and invited him to take a seat in his carriage with him, and that soon after he had done so the prisoner drove up in his carriage and getting out of it, sat down on a log within hearing of him, but before that, and as he drove up the deceased remarked to him "there's Silas Hollis, applying a very vulgar and opprobious epithet to him and adding that he intended to sluff him before he left the place. That he endeavored to dissuade him from his purpose and from getting out of his carriage, but he only seemed to take offence at his efforts, got out of the carriage and went up to where the prisoner was sitting and said something to him, when they sat down together and entered into conversation with each other; and very soon afterward he saw the prisoner offer his hand to the deceased and heard him say to him "let us drop all these matters and make up," but the deceased refused to take his hand and cursed it. Very soon afterward he heard the deceased say to him that he had "a d______d worthless bitch of a wife," to which the prisoner instantly replied that he did not wish to hear anything more on that subject and when both sprang to their feet, face to face, the deceased shaking his fists with great violence in the face of the prisoner and abusing and cursing him in the coarsest terms all the while, the prisoner for a time remaining entirely passive and silent in his position. This continuing, however, after a short time he said to the deceased, he did not want him to strike his fists too long about his head, to which he replied that he could strike his fists about his head as long as he pleased, and damn *Page 26 
him, he could whip him besides. Pretty soon after that they closed for a fight, but persons in the surrounding crowd interposed on either side and separated them, the prisoner's face being severely scratched in the collision. The prisoner then seized and picked up a stave from the ground, but on the application of a by-stander, surrendered it to him, and subsided again into comparative silence and inactivity, the deceased struggling with great fury and violence to escape from those who were detaining him, and to rush again towards the prisoner. Finally he effected his escape from those detaining him, and suddenly snatched up from the ground lying near him, a green persimmon stick or pole two or three inches in diameter, and just as he had recovered his erect position and drawn it back in both hands to strike, the prisoner rushed at him and struck him with a slave on the head and felled him to the earth. He was never able to rise or stand afterward without assistance, and soon became unconscious and died on the following day. The stave was four or five feet long, three or four inches wide and about an inch thick. The blow struck with it was on the parietal bones of the head, producing a wound of the skull three inches in length and a half an inch in depth, and the post mortem examination disclosed a fracture of the skull beneath it between two and three inches in length, and about five ounces of coagulated blood upon the brain.
The killing of one preson by another being proved, it is presumed to be felonious and malicious and murder at common law, *Page 27 
because malice is at least implied from the act of killing, until it otherwise appears, and circumstances of alleviation or mitigation must be shown, or must appear in the proof on the trial, to rebut that presumption. It has been conceded, however, by the prosecution in this case that the facts and circumstances proved do not afford evidence of that degree of malice which is denominated express malice in law, and that it is not, therefore, a case of murder in the first degree under our statute. And we will go further, and say to you now that we do not think that this constitutes a clear case of murder, even of the second degree under it; and we say so because we do not think the facts proved, warrant or justify such a conclusion, and if such a verdict should be rendered, with our view of the application of the law to the facts and circumstances in proof before us in the case, we should feel constrained to arrest the judgment. But neither fear, nor apprehension of death, or of great bodily harm, will totally excuse one person for killing another; but to have that effect in law, the danger must be imminent and impending at the instant, and it must also be real and not imaginary. He must also have declined the combat and retreated from his assailant as far as he could do so consistent with his own safety, and the hazard to his life or person must be so great, so pressing and immediate as to admit of no further retreat, on his part to avoid the necessity of killing his assailant, without imminent danger to his own life or person, or affording some great advantage to him in the crisis impending between them. He would, in conclusion, say to the jury that if they believed the evidence, it was in the opinion of the Court a case of manslaughter.
 Verdict accordingly. *Page 28